Delivery via First-Class mail (USPS)



The Hon. Margo K. Brodie
The Hon. Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201



Re: United States v. Andre Wilburn, No. 19-CR-108 (MKB)
Re: United States v. Andre Wilburn, No. 19-CR-139 (RJD)

Dear Chief Judge Brodie and Judge Dearie:

The defendant, Andre Wilburn, without waiving any other motions, and to be considered to and in connection with any previous bail motions, respectfully requests a conference and a bail hearing, pursuant to Title 18 United States Code Sections 3141-3156 ("The Bail Reform Act"), the Fifth Amendment Due Process Clause, and the Sixth Amendment right to effective "assistance of Counsel," the Eighth Amendment right to be free of excessive bail, and Rule 16 of the Federal Rules of Criminal Procedure. The defendant requests this hearing before Your Honors for the purpose of adequate and unhindered preparation of his defense to the extent that he desires. Or in the alternative, defendant requests an order of release from custody subject to the least restrictive condition or combination of conditions. see T18 USC 3142(c)

Defendant seeks review of the following to confirm that these proceedings were accurate, conformed with the Bail Reform Act, that any waivers were valid, and that they were fundamentally fair and in line with the Eighth Amendment to the United States Constitution.

A. January 29, 2019 arraignment, transcripts, and detention order in the Southern District of California ("SD Cal") before The Hon. Linda Lopez;

B. February 19, 2019 arraignment, transcripts, and detention order in the Eastern District of New York ("EDNY") before The Hon. Peggy Kuo and;

C. April 23, 2020 teleconferenced detention hearing transcripts and Minute Entry in the EDNY before The Hon. Roanne L. Mann.

PRO SE OFFICE

The defendant is requesting a written finding of facts and a statement of reasons from the Courts supporting both pretrial detention and proof of probable cause from each of the above proceedings. Defendant has reason to believe probable cause was not promptly determined and probable cause to detain defendant was not established until February 28, 2019, six weeks after January 15, 2019 arrest. see 18 USC 3142(i)(1) and 3142(e)(3); United States v. Nwokoro, 651 F. 3d 108 (DC Cir 2011) (District Court failed to make required assessment with respect to release or detention, and to adequately memorialize its determination in form of written or oral on-the-record findings of fact and statement of reasons for detention; its factual finding and reasoning were insufficient to demonstrate that it considered all information available concerning statutory factors and made reasoned decision... under 3142(f)) see also United States v. Smith, 424 F. 3d 992, 999 (9th Cir 2005) ("initial appearance before magistrate judge" applies to arrests under warrant issued upon a complaint...); Fed R. Crim P. 5(a); Bryant v. City of New York, 404, F. 3d 128, 13-139(2d Cir 2005) (Duration of plaintiffs detentions pending probable cause determination did not come close to presumptively unreasonable 48-hour mark.)

## I. Background - Nature / Circumstances

The Defendant is charged with 2 counts of access device fraud, aggravated identity theft, conspiracy to commit access device fraud, wire fraud, and conspiracy to commit wire fraud in a 6-count indictment returned in March 2019, case No. 19-CR-139 (RJD) ("The fraud case"). On October 24, 2019, the defendant pleaded guilty to access device fraud and aggravated identity theft, he has yet to be sentenced in that case as of the date of this letter. Defendant is currently in the process of withdrawing the guilty plea for several fair and just reasons. Defendant is also charged with production and possession of child pornography, case No. 19-CR-108 (MKB) ("the MKB case"), contraband that was allegedly discovered during the investigation of the fraud case. Despite Court documents stating otherwise, defendant has evidence to show the fraud case was initiated in late spring/early summer 2017 with the search of eBay and PayPal records. It should be noted that the government has not produced or allowed inspection or copying of any affidavits, applications in support, or search warrants that authorized these 2017 data extractions of eBay, PayPal, etc. data, nor are they available on the Courts electronic records website at pacer.gov.

Despite the guilty plea in the fraud case, it has been unreasonable for defendant to remain detained since Mr. Wilburn has never been able to inspect, photograph, or copy the majority of his discovery, in either the fraud case or the MKB case, or review it with his attorney in a meaningful way. Legal visits at MDC Brooklyn are oftentimes limited to 1-hour in duration, meanwhile it takes up to 2-hours just to get downstairs to the visiting room from the housing units. Had the government and defendants former counsel allowed for the inspection of Rule 16(a)(1)(E) material, as was requested by the defendant on multiple occasions both prior and after pleading guilty, the defendant would not have been subjected actual prejudice in the MKB case and non-trial prejudice in both cases due to the discovery violations.

Mr. Wilburn's mother and girlfriend are still eager to have him stay with either of them on home confinement because they are aware of the

prejudice that has been inflicted upon him since his January 15, 2019 arrest, the prejudice due to inadequate access to the Courts and access to counsel at MDC Brooklyn, and the defendants contraction of COVID-19 where he was only treated with generic Tylenol. They simply want the defendant to successfully and adequately fight his case to prove his innocence so that he could finally move past the most traumatic ~~experience~~ experience of his life.

These are compelling and "exceptional" reasons warranting the defendants release pursuant to the Bail Reform Act.

## II. Weight of the Evidence

The government contends that the evidence against the defendant is strong, with alleged photographic evidence in the MKB case. According to defendants PSR in the fraud case, discovery ~~against~~ in the MKB case concluded in March 2020. Had the weight of the evidence against the defendant been as strong as the government claims, then the government would have objected to the multiple unauthorized continuances by former counsel (mostly due to a suppression motion that took over 2 years to draft and was never completed or submitted) and respectfully requested to proceed to trial. Aside from the numerous discovery violations, there are also Fourth Amendment violations in regards to several search warrants in both cases, Sixth Amendment "nature clause" violations, and violations to the Fifth Amendment "due process clause." Not only has the defendant been unable to inspect or copy the majority of his own discovery, there is also no evidence to support a grand jury review of the accusations from the criminal complaints in either case.

The government has a Constitutional, statutory, and regulatory duty to disclose discovery, and that duty to disclose continues throughout the proceedings. See Cone v. Bell 556 Us 449, 469 (2009)("When the state with-holds from a criminal defendant evidence that is material to... guilt or

punishment, it violates [the] right of due process of law); U.S. v
Thomas 239 F. 3d (2d Cir 2001)(duty to disclose continues... requiring
government to disclose material to defense "promptly," meaning as soon
as prosecutor becomes aware of it); Fed R. Crim. P 16(c)

Under Brady v. Maryland, a prosecutor may not refuse evidence
that is "material" to either guilt or punishment. Brady applies to
evidence that supports defendants claim of innocence and also evidence
that weakens the governments case. see Kyles v. Whitley, 514 US 419, 433
(1995)(Evidence is "material" where there is a reasonable probability that
its disclosure would have produced a different result at trial)

The government claims that 100000 images were found in the
defendants home is not found anywhere in the superceding indictment.
The detailed accusations presented by the government in their April
22, 2020 response to former counsels motion for temporary release is not
found in the indictment. It is unclear if any of this was presented to the
grand jury at all. The Fifth Amendment guarantees that a criminal defenant
will only be tried on charges alleged in a grand jury indictment. see
United States v. Hill, 2017 US App. LEXIS 15678(4th Cir 2017)(Facts outside
an indictment should not be used to conclusively decide whether an element of
a criminal offense is satisfied during a pretrial motion, and a Congressional
statute should not be overturned on an incomplete record.)

Judicial officers did not first consider less restrictive alternatives
before ordering detention. The defendant believes that the details in the
complaint in the MKB case is a striking example of "unfair prejudice." In this
context meaning "an undue tendancy to suggest decision on an improper basis,
commonly, though not necessarily, an emotional one." Put another way, Courts
should be sensitive to any "unfair prejudice that results from the capacity
of the evidence to persuade by illegitimate means." see Advisory Committee Note
to Federal Rules of Evidence 403; 22 C. Wright and Graham, Federal Practice

6

and Procedure Section 5215 at 275 (1978); see also United States v. Diaz, 878 F. 2d 608, 615 (2d Cir 1989)

In its response to defendants April 2020 motion for an order of temporary release due to deplorable prison conditions at the onset of the COVID-19 Crisis at MDC Brooklyn (during which the defendant actually contracted COVID-19), the government states "evidence gathered during the investigation of the Fraud case revealed that the defendant had equipment to make forged credit cards and identification cards in his home." [See Exhibit "A" - Government 04/22/20 response to bail motion at 4.] This statement is prejudicial and is indicative of a pretext search since:

A) Search warrant of defendants apartment ("the premises") was not in regards to fraud investigation at all, the search warrant was actually for the MKB case, not the fraud case.

B) There are serious particularity deficiencies with the premises warrant. see 49 Geo. L.J. Ann. Rev. Crim. Proc. 34 (2020)(The Fourth Amendment requires that a warrant describe with "particular[ity].... the place to be searched and the persons or things to be seized." This limitation safeguards the individual against "the wide-ranging exploratory searches the Framers [of the Constitution] intended to prohibit."); see also United States v. Rosa 626 F. 3d 56, 64 (2d Cir 2000); U.S. v. Lustyik, 57 F. Supp. 3d 213, 230 (SDNY)(2014)

C) The premises warrant, among many other search warrants, was never returned to the "magistrate judge designated on the warrant." This is a deliberate indifference and a flagrant violation of the Federal Rules of Criminal Procedure and is just a small part of the clear pattern of neglect from the government, as there are no records of any search warrants in either case being properly returned to the judicial officer. see Fed R. Crim. P. 41 (f)(1)(D)

D) The premises warrant is newly discovered information that was not disclosed to defendant by former counsel on or before or after 04/23/2020 detention hearing. In fact, defendant did not see the premises warrant until 2021, when it was sent to the defendant

by his mother.

E) The probative value of this evidence does not outweigh its prejudicial effect. see Fed R. Ev. 403

The fraud case indictment does not mention "forged credit cards... personal identity information (PII)... or [forged] identification cards" at all. These terms were intentionally used to mislead the judicial officer in order to create a variance in charged conduct, thereby prejudicing the defendant. A grand jury did not produce a true bill [indictment] pertaining to any of these prejudicial accusations from the government. These terms are loosely used in both 04/22/2020 response letter and defendants Pre-Sentence Report in the fraud case. The fact that the government has to substantially alter the facts in the indictments to sustain a detention order is a clear and convincing indicator of weak evidence. see United States v. Delgado, 256 F. 3d 264 (5th Cir 2001)(Only grand jury can amend indictment.)

In addition to the evidentiary and search warrant deficiencies described previously, there are Fourth Amendment issues with the Google Warrant as well. It should be noted that a suppression motion for the MkB case has been pending since at least April 2019. The combination of challenging both the Google Warrant and the premises warrants seriously weakens the governments case and undermines the alleged evidence against the defendant. The defendant still has not seen the majority of discovery in either case, and has yet to be fully apprised of the nature of the accusations against him in the MkB case.

The government was also sure to quote particular parts of a text message thread, which made it easy to take the true meaning out of context. It's clear and convincing based on the full and uncensored text messages that the defendant was terrified of the criminal justice system. The defendant has never been in trouble with the law prior to this and was genuinely afraid of the "judicial system" treating him unfairly based

on him being "darker than a paper bag." Below is an excerpt of the true interpretation of the text message. [see Exhibit "B" - Text Messages WIL000236-37]

Defendant: New [stuff], identity theft mostly
    By the way, the aforementioned is not to be [sic] disclosed to anyone.
    .... I decided to listen to people I had no business listening to in order to fast forward through life.
    There is no fast forward button.

The exchange continues with clear implications of fundamental unfairness being a real possibility because of his race:

Defendant: ... I should've probably just turned myself in... and fought the case just to lose.
    Been free [on bail] for a year to go away for a decade
    Black males don't do too well in the judicial system
"Witness": 10 [years] is a long .... time.
Defendant: It is, but that's what they do to [people] darker than a paper bag.
    I'm definitely not cut out to be in a cage.

The defendant clearly was fearful of being treated unfairly and that he would lose, not because of any facts or circumstances, but because he is a Black man. The fact that the defendant has been detained for almost 3 years (and has not been sentenced in almost 2 years) despite the provisions of the Bail Reform Act, convincingly shows that his fears were meritorious and extremely reasonable.

And finally, the government's pattern of neglect and misconduct by unreasonably searching tens of thousands of Google Drive digital files

for evidence of fraud, searching and seizing items beyond the scope of the warrant from both Google and the premises, knowingly presenting evidence and facts that are not in the indictments, purposely altering context of alleged text message conversations, willingly misleading judicial officers, intentionally refusing to return search warrants or even allow the defendant to inspect them, ~~multiple other~~ & partaking in multiple other discovery and Brady violations, and sending law enforcement agents to the defendants mother to show her photos of a fully engorged penis severely weakens the weight of the evidence against the defendant and undermines the the public ~~per~~ perception of fundamental fairness of the judicial process in both cases before Your Honors.

## III. History/Characteristics

Mr. Wilburn is 36 years old, educated, charismatic, has strong family ties and support, was an integral part of his community on the Lower East side of Manhattan, is creative, business savvy, and has never been in trouble with the law prior to these charges.

### A. Community Ties.

The defendant was actively involved in the day-to-day operations of several businesses in his community. Many hours were spent each day learning the fundamentals of business ownership and entrepreneur life from local business owners and employees. From the local ~~bodega~~ bodega, to bars, to high-end retailers, the defendant was close to several business owners and developed trust and rapport from many of them. The defendant was always helpful and filled in roles for a short time when necessary. There was no part of the business that was off-limits as the defendant always maintained a high level of respect and trust. The defendant aided in branding and marketing campaigns for no pay simply for the satisfaction of helping community businesses. The defendant not only helped local businesses, and built his own, he was also well respected by those who lived in less than modest conditions. The defendant routinely

conversed, ~~and~~ purchased, and ate meals with the homeless in the community. In the past, he has also "panhandled" to collect money to purchase blankets for the homeless in the coldest months of winter. Although none of this was done for recognition, one of these panhandling sessions was recorded and is still available on the Internet to this day. [See Exhibit "C"]

B. Employment

The defendant started a business consulting firm, New York Consultant Group in 2009 with a partner. The website is down and the domain has been lost due to the defendants incarceration. It was in this venture that the defendant honed his passion for branding and marketing. A consulting firm was also a way to help businesses and ~~to~~ make a living. In ~~the~~ 2014, the defendant began work on his own clothing line, soulAir, combining his creative and business sides into one. For the next 4 years, the defendant meticulously worked on developing prototypes, ~~and~~ package designs, commercials, photoshoots, brand identity, and finalized products. By 2017, soulAir had its own identity and social media following due to the efforts of Mr. Wilburn. It should be noted that every tag, stitch, and embroidery was done locally in the community to support the tailor industry and so the brand could proudly display "hand crafted in NY." ~~a~~ In 2018, the defendant planned to officially launch soulAir in southern California, with ~~an~~ early 2019 east coast (New York City) launch to follow. Due to the defendants incarceration, the soulAir website has been taken down, and several valuable domains have expired. ~~According to~~ Moreover, all prototypes (clothing), accessories, original packaging, all one of a kind designs were stolen from the defendants apartment along with all of his other physical possessions, furniture, family heirlooms, and other sentimental items like the time capsule from the year 2000 that was to be opened in 2020. SoulAir was never launched. See instagram.com/flysoulair; instagram.com/nyconsultantgrp

## C. Family Ties

The defendant is currently supported by his family, with his mother leading by not only providing financial support, but sending caselaw, newspaper articles, PACER.gov updates, motivational quotes, greeting cards, and consistently boosting his confidence in his mission of proving his innocence, even though the statistics are not in the defendants favor. In the past, prior to his arrest and subsequent permanent detention, it was the defendant that the family could count on to help. The defendant was so family-oriented that he started a group chat just for family to keep in touch, post birthdays, photos, etc. The defendant is adored by his immediate family and his cousins, aunt, and uncle. He loved the company of his maternal grandmother until her passing in 2020. The defendant was devastated by this news and it was even worse because a chaplain delivered it through a locked cell door while the unit was on lockdown status. The defendant was not himself for several weeks because he was unable to help or console his family or even attend the virtual vigil.

The defendant is not married, has no children, is not mentally ill, does not abuse drugs or even drink alcohol, and is in relatively decent health. The defendant has no cash and is in debt with a very low FICO score due to the inability to pay any bills while incarcerated. The defendant has not been convicted of a crime more than a traffic citation. In fact, the defendant received a speeding ticket in an unknown part of California during a road trip from New York City to Southern California in 2017, contested the ticket, and flew back to California and rented a car just to make it to traffic court to contest the ticket.

The defendant, despite an almost 3 year incarceration, has strong community and family ties and is more than just these charges.

IV - Nature and Seriousness of
A. Flight Risk

Generalization that guilty plea, which defendant is seeking to withdraw for several fair and just reasons, "possibly increas[es]...risk of flight" is completely unfounded, meritless, and not in line with the statutory requirements of 18 USC 3142 of the Bail Reform Act. The government failed to provide any caselaw, statutes, [Congressional] legislative history, or supporting facts to justify this arbitrary statement.

The actual statutory standard for determining flight risk are:
a) 18 USC 3142(b) - bail is presumptively available for accused awaiting trial
b) 18 USC 3143(a) - bail is presumptively unavailable for those awaiting sentence

A presumption of detention could be rebutted by the defendant, and it is up to the judicial officer to decide after weighing the facts presented to the Court. The government's unverified and unsupported generic statement falls short of the preponderance of evidence standard required for flight risk assessment. A guilty plea, especially a contested one, does not inherently align with the BRA's flight risk assessment standards. Moreover, mere opportunity for flight is insufficient grounds for pretrial detention. If a judicial officer finds, after reviewing facts, that release on personal recognizance or unsecured appearance bond will not provide requisite assurances, the judicial officer must impose the least restrictive bail conditions necessary to assure appearance and safety. see United States v. Himler, 797 F.2d 156 (3d Cir 1986) (Opportunity to flee is not enough to justify detention as the Bail Reform Act does not seek ironclad guarantees.)

While it is true that a hearing may be held in connection

with any bail decision, detention may only be ordered "after a hearing pursuant to the provisions of subsection [3142](f)." Therefore, as stated in the legislative history of the Act, "the requisite circumstances for invoking a detention hearing in effect serve to limit the types of cases in which detention may be ordered prior to trial." Pretrial detention may not be considered except under carefully specified circumstances. So it is reasonable to interpret the statute as ~~authorizing~~ authorizing detention only upon proof of a:

    i) likelihood of flight
    ii) threatened obstruction of justice, or
    iii) danger of recividism in one or more of the crimes actually specified by the bail statute.

    The defendants indicted offenses do not involve any of the offenses specified in 3142(f).

    Judicial officers making risk of flight determinations are guided by the factors set forth in section 3142(g), including the nature and circumstances of the offenses charged, the weight of the evidence against the person, and the history and character of the defendant. Applying all of the standards, it is difficult to understand how The Hon. Roanne L. Mann made a finding to support "no condition or combination of conditions will reasonably assure the appearance of the defendant at trial." The government is in possession of the defendants passport and defendant's drivers license (which is expired). The defendants financial resources have been drained.

    Although the government intentionally misled the judicial officer by writing in their response letter to bail motion that "access to fraudulent identification documents undoubtedly increases the risk of flight posed by the defendant," the truth is that there is no per se presumption of flight where the crime charged involves the production of fraudulent identification.

The government is again presenting information that was never presented to either the defendant or the grand jury, so it is unclear where these allegations stem from, making this statement immaterial to the case at hand. Despite the government again using immaterial evidence in an attempt to prove a weak flight risk point, the defendant would not be a flight risk even if any of his charged offenses involved "equipment to make... identification in his home." Which according to the indictment is totally false and just is another example of the prosecutorial misconduct and pattern of neglect on behalf of the government. These slanderous misrepresentations continue to prejudice the defendant's defense and he could only hope that this is not a premonition of what is to come at trial.

Despite the prosecutors narrative "that the defendant absconded to a state where he has no known family or relatives," the clear and convincing evidence establishes that not only does he have relatives in California, but also has business ties to Southern California due to his clothing line.

There is no direct evidence that suggests the defendant would flee from prosecution in the future. see United States v. Friedman, 837 F. 2d 48, 49-50 (2d Cir 1988) (preponderance of evidence did not show flight risk because defendant was longtime resident of area, had no prior criminal record, had no passport or ability to evade surveillance, and had family in the area.); 49 Geo. L. J. Ann. Rev. Crim. Proc. 401-402 (2020) (When accessing flight risk, courts consider a variety of factors, including the defendants ties to the community, past criminal record, and availability of assets.)

Whether the defendant is likely to flee is a finding that must be made on the basis of evidence presented at the detention hearing. see Higazy v. Templeton, 505 F. 3d 161, 173 (2d

Cir 2007) (detention determination generally may not be made on evidence submitted ~~ex~~ ex parte [on one side only ; by or for one party].) see also United States v. O'Brien, 895 F. 2d 810, 816 (1st Cir 1990) (presumption of flight risk rebutted by evidence of effectiveness of electronic bracelet [monitoring]...); United States v. Carbone, 793 F. 2d 559, 561 (3d Cir 1986) (presumption of flight risk rebutted by... fact that defendant was first time offender... and would be confined to parents' home...)

And finally, the governments claims that the defendant "has a history of fleeing from justice" is slanderous, inflammatory, and without merit. see 18 USC 1075

8. Danger to the Community

~~[illegible crossed out text]~~ The defendants offenses alleged in the MKB case fall under the Adam Walsh Act ("AW Act"). Congress has not specifically stated that AW Act offense automatically makes defendant a danger to the community (3142 (f)). The AW Act merely requires a defendant charged with certain listed crimes crimes, if released before trial, be placed on a prescribed minimum set of release conditions. AW Act does not inherently mean danger to the community as the government misrepresentations has led the court to believe. Additionally defendants still have a right to a detention hearing, to rebut any presumptions, and individualized determinations as to bail. see United States v. Himler 797 F. 2d 156 (3d Cir 1986) (Defendant could not be detained as a danger to community... because he had not committed any of the crimes under which Bail Reform Act of 1984 considered a defendant dangerous.)

A detention hearing, for considering detention was not ~~appropriate~~ appropriate since defendant's alleged offenses do not fall under 18 USC 3142 (f). A hearing for setting conditions of release is what was supposed to be statutorily required. "Danger to the

community" is broad generalization that has no realistic ████ basis in this case and requires the prosecutor to show specific danger to individuals or the community with regard to the individual seeking release. The Third Circuit held that proof of danger to the community other than from those offenses in 3142(f) will not support a motion for detention. see United States v. Millan-Vasquez, 2013 App. LEXIS 26562 (8th Cir. Apr. 18, 2013)(circuit court believed it prudent to seek clarification of detention order...); see also United States v. Dillon, 938 F. 2d 1412, 1416 (1st Cir 1991)(to rebut presumption [of dangerousness], defendant bears only burden of production and burden of persuasion remains with government; United States v. English, 629 F. 3d 311, 319 (2d Cir 2011)(same)

   For reasons unknown to the defendant, former counsel suggested the unrealistic condition [of release] ~~of the~~ that defendant have "no access to the Internet and any devices would be monitored by pretrial." This is not in line with the Bail Reform Act which calls for "least restrictive... condition or combination of conditions." (3142(c)). There is a difference between requiring that the defendant not have access to the Internet and demanding reasonable assurances of community safety. Insisting on a guarantee that the defendant not have Internet access amounts to impermissibly turning the Bail Reform Act's standard of reasonable assurance of community safety into one of absolute certainty. Internet access is required for the defendant to adequately defend himself to the extent that he desires. Internet access is more available and prevalent than ever before, so former counsel's contention that "Mr. Wilburn... [have] no access to the Internet" would imply that anyone charged with like conduct be held in pretrial detention. In fact, former counsel's flawed substantive logic is evident in United States v. Valero, where the Court disclaimed any categorical rule that those accused of producing child pornography must be put in detention, and

instead explained that its ~~dent~~ detention order was based only on the
specific factors in that case. Former counsel intentionally recommending
conditions that were not required by the Bail Reform Act nor suggested
by the government proved to be detrimental to the defendant. Additionally,
nothing in the indictment suggests that the defendant's alleged conduct
took place through Internet communication, so former counsels' statements
also played a major role in the defendant's almost 3-year detention and
non-trial prejudice. see United States v. Valero, 9 F. Supp. 3d 283 (EDNY
2014) see also United States v. Bert, 814 F.3d 70 (2d Cir 2016)

　　　Presumption of dangerousness alone is not enough to detain
a defendant when rebutted. see United States v. Stone, 608 F.3d 939,
947 (6th Cir 2010) (presumption of dangerousness rebutted by character
witnesses and lack of criminal history.); United States v. Abad, 350
F.3d 793, 798 (8th Cir 2003) (presumption of flight and dangerousness
rebutted by pretrial report, letters from community members [and]
evidence that defendant's family would act as third-party custodians);
see also 49 Geo. L.J. Ann. Rev. Crim. Proc. 409 (2020) (The BRA provides
that, subject to certain specific conditions, "information obtained
in the course of performing pretrial services functions in relation to
a particular accused shall be used only for the purposes of bail
determination and shall otherwise be confidential.")

　　　~~Release~~ The defendant is not dangerous and release conditions
will reasonably assure the safety of the community based on the
above and defendant maintaining his innocence ~~the~~ throughout the
MKB ~~case~~ case proceedings. see United States v. Speed Joyeros, 204
F. Supp. 2d 412 (EDNY 2002) (acknowledging general policy of release
of prisoners pending trial.)

　　　And finally ~~without~~ the government has failed to prove
dangerousness by clear and convincing ~~the~~ evidence. The government's

"facts" are outside the scope of the indictment and the numerous fraudulent misrepresentations completely breakdown the government's ability to convince even by a preponderance of evidence standard. see 18 USC 3142(f); United States v. Ferronti, 66 F. 3d 540, 542 (2d Cir 1995)\$; United States v. Chimurenga, 760 F. 2d 400, 405 (2d Cir 1985) (Clear and convincing evidence is more than a preponderance, but less than "beyond a reasonable doubt," and requires "that the evidence support such a conclusion with a high degree of certainty."); United States v. Medina, 775 F. 2d 1398 (9th Cir 1985) ("Clear and convincing evidence standard applies only when there are conditions that may threaten the safety of a person or a community, otherwise, the correct standard to be applied is the preponderance of the evidence standard"); see also United States v. Dillard, 214 F. 3d 58 (2d Cir 2000) ("If offense not "crime of violence," no detention hearing held and defendant must be released.")

## V. Lack of Probable Cause and Written Findings of Fact

Once a judicial officer has determined that the accused should be detained, a written order must be prepared. The order must contain both written findings of fact and a written statement of the reasons for the detention. see United States v. Nwokoro, 651 F 3d. 108, 109 (DC Cir 2011) (Trial court failed to prepare necessary order.)

A transcript of the detention hearing does not constitute an order because it does not show that the district court considered all of the statutory factors and make a reasoned decision that defendant was a serious risk of flight and that no condition or combination of conditions could reasonably assure that he would appear for trial. If such a condition occurs, the court will be required to prepare findings of facts and statements of reasons supporting pretrial detention or the defendant should be ordered to be released subject to appropriate conditions. see 18 USC 3142(c)

Former counsel, both in SD Cal and EDNY [Marc Gellar and James Dorrow] failed to review these documents promptly, to make certain they they included the required finding of fact and statutorily appropriate bases for the detention order. This was ineffective assistance of counsel, but the defendant was not aware of this until he started conducting his own jurist research well after these proceedings. Although an indictment is sufficient to establish probable cause to invoke presumption of dangerousness, the defendant was not indicted at his initial appearance in SD Cal on January 29, 2019 (it should be noted that arraignment was 14 days after arrest on 01/15/19 offending Fed R. Crim. P. Rule 5(a)(1)(A).) or on February 19, 2019 at his EDNY arraignment. Defendant was arrested on a criminal complaint, meaning judicial officers made no probable cause determinations. See Jones v. City of Santa Monica, 352 F.3d 1052, 1055 (9th Cir 2004)(Probable cause determinations made within 48 hours of arrest are presumptively prompt.); United States v. Smith, 424 F.3d 992, 999 (4th Cir 2005) ("initial appearance before magistrate judge" applies to arrests under warrant issued upon a complaint...); Fed R. Crim. P. Rule 5(a); see US Const. Amend. IV

Fourty-Eight hour time to be seen before magistrate judge
  A) did not comply with Fed R. Crim P. 5(a)
  B) lacked "probable cause" and "oath or affirmation" required by Amendment Four to the United States Constitution.

Defendant was not seen by magistrate judge for his initial appearance for two weeks after arrest. The Supreme Court held that, absent showing of extraordinary circumstances, a defendant must be brought before a judge within 2 days. Detention pending probable cause determination presumptively unreasonable after 48-hour mark. This extraordinary delay is also a violation of the 4th Amendment right to a prompt judicial assessment of probable cause to support

detention. Rule 5(a) applies because of State and Federal "working arrangement."

The following highlights deficiencies in arraignments and detention hearings in the SD Cal and EDNY. It should be noted that none of the official Court documents used as Exhibits were supplied by former counsel and were sent to the defendant by his mother from PACER.gov.

i) SD Cal Arraignment – 01/29/2019

The following is an excerpt from the "Finding of Fact and Detention order issued by Magistrate Judge Linda Lopez 14 days after the defendants arrest.

"At the hearing on January 29, 2019, the Defendant knowingly and voluntarily waived all rights on the record and through counsel, to the setting of bail and the detention hearing. Based on that waiver, the Court orders that Defendant be detained pending trial."

It's worth noting that some rights are not waivable. When a defendant waives a right, they must know the facts and intend to give up that right. Otherwise the waiver will not be valid. The defendant did not know his rights, what an arraignment or detention hearing was, or the facts of how and why accused are detained pretrial. Therefore, despite never being supplied with evidence of a waiver, the defendants waiver is invalid. Additionally, judicial officer did not prepare a valid Finding of Facts that contains statutorily appropriate bases for the detention order. A detention hearing was not warranted due to there being no determination of probable cause, because the defendant was arrested on a complaint and not indicted in the MKB case until February 28, 2019, 44 days after his arrest, in violation of the Speedy Trial Act. see 18

USC 3142(f); Fed R. Crim. P. 5; see also 18 USC 3162; United States v. Lopez, 426 F. Supp. 380 (SDNY 1977)(18 USC 3162(a)(2) reflects purpose not solely to insure prompt disposition of criminal cases in order to protect rights of those charged with crimes, but public's interest in having criminal matters promptly resolved.); Smith v. Hooey 393 US 374 (1969)(The fact that the defendant is incarcerated in another jurisdiction does not relieve the government from providing a speedy trial...); see also Exhibit "D" (Finding of Fact 19-MJ-204-LL)

## ii) EDNY Arraignment -02/19/2019

Magistrate Judge Peggy Kuo did not prepare a written order that contains both findings of fact and a written statement of the reasons for the detention. Judge Kuo prejudiced the defendant by ordering detention without properly applying the statutory requirements. EDNY "detention hearing" and initial appearance lasted only three minutes in duration, which clearly shows that protocols were not adhered to. The defendants defense has been severely prejudiced due to the inability to properly investigate his case (including his apartment prior to being burglarized) and inspect evidence in the MKB case. The government used the defendant's detention to commit Brady violations (and other discovery violations) and continue to bolster a weak case despite the defendant maintaining his innocence throughout these proceedings. see United States v. ~~Minnunos~~ Quinnones, 610 F. Supp. 74 (SDNY 1985)(When detention hearing held before magistrate results in oral order that defendant be detained, but no written order is issued... rather than detention order, District Court must issue written release order...) see also id 3142f); id Rule 5; id Lopez; Byrnes v. United States, 327 F. 2d 825 (9th Cir)(At arraignment, magistrate must satisfy himself that there is probable cause to believe that crime was committed and that defendant committed it.) see also United States v. Bundy, 968 F. 3d (9th Cir 2020)(indictment was properly dismissed because given evidence that government acted with at least

reckless disregard for Brady value of some evidence that prejudiced defense's ability to marshal their case, district courts substantial prejudice and flagrant misconduct findings were not clear error.)

## iii) EDNY Detention Hearing - 04/23/20

At a detention hearing, the defendant has a right to testify and to present witnesses on his behalf. The defendant was denied this right under the guise of a speeding hearing when former counsel said that "it may take longer and I know you want things to go faster," in an email (Trulincs message) dated April 8, 2020. Counsel allowing me to waive my appearance without fully explaining my rights and exactly what is being waived is ineffective counsel and invalidates waiver. see Exhibit " " (Trulincs— Darrow, James 04/08/2020); see also Blue v. United States 342 F. 2d 894(1965)(Accused who is wrongfully denied opportunity to present witnesses on his behalf is entitled to order reopening hearing for presentation of further evidence.)

In an email sent on 04/23/20, following "detention hearing," former counsel James Darrow explained to defendant that he did not understand two points Magistrate Judge Roanne L. Mann made, but did not question them during the tele-conferenced hearing:

a) "[Magistrate Mann] found that the lack of communication between us about the motion was not important because everything is being delayed in court now, trial being adjourned until June. I frankly do not understand that at all." The defendant is unsure why former counsel did not explain to The Hon. Roanne L. Mann that access to counsel is a Constitutional right.

b) "[Magistrate Mann] said that in response to my point

that all your property was locke din [sic] a basement somewhere, that was not taken by the government, so you had no means to flee or make fake IDs. Again, I fail to understand the response." And again, the defendants former counsel did not make a zealous effort to clarify Magistrate Mann's statements, nor did Mr. Darrow make a reasonable effort to ensure that the defendants constitutional right to his property was not violated. There is absolutely nothing in the fraud case indictment that mentions "fake IDs," so it is unclear why that was even said by Magistrate Judge Mann. And the government may not have stolen all of defendants property (property has not been returned to defendant to this day despite it being immaterial and having no obvious connection to either case), but it is clear that the governments actions compromised the security of the entrance to the premises, facilitating the theft of defendants personal property and effects. see US Const Amend 6; Us Const Amend 5; United States v. Hernandez, 943 F.3d 1196 (9th Cir. 2019)(in assessing a motion to detain a defendant pending trial, a district court had to conduct an individualized evaluation that was guided by the factors articulated at 18 USC 3142(g)) see Exhibit "E" Darrow, Trulincs 04/23/20

The governments pattern of fraudulent misrepresentations and serious and blatant misconduct continued in the April 22,2020 reply letter when describing the defendants proferred third party custodians.

a) When federal agents were attempting to locate the defendant and execute the arrest warrant, they interviewed the defendants mother, in December 2019. She reported in sum and substance, that

(1) she did not know any of the defendant's friends

Federal agents never interviewed the defendant's mother in December 2019, but when they did interview her, she specifically said that she did not know co-accused in the fraud case. Agents asked if she has "ever heard of Micek, Brown, and Nelson," not if she knew "any of defendants friends."

(2) she did not know if he currently had a girlfriend
Defendant's mother did not need to know defendant's romantic life. The defendant did not live in his mother's home.

(3) she had not seen or spoken to her son in approximately 4 months
The defendant's mother did not say that, last time was October 2018.

(4) she did not know whether her son was employed
The defendant's mother knew all about soulAir, the defendant's clothing brand.

(5) her son had never visited her home in Wilkes Barre, PA.
The defendant's mother had recently moved from Buck's County. The defendant has visited all of his mother's apartments including the one in Buck's County.

The defendant's mother is absolutely in a position to serve as a reliable third-party custodian based on her continued daily support by sending PACER.gov updates each week along with court documents and her criminal justice background. The defendant's mother is a former New York City Department of Corrections employee.

(6) The other proffered custodian is the defendants girlfriend, Ashley Cotto. The government contests her fitness as a custodian due to the fact that while the defendant was in California fleeing from authorities, Ms. Cotto was staying with the defendant in a

hotel. The defendant had no legitimate reason for being in California, and Ms. Cotto's choice to follow him to California, despite being raised in New York, suggests that she is not a reliable third-party custodian.

While it is ~~too~~ an undeniable fact that "Ms. Cotto was staying in California with ~~a~~ defendant" at the time of his arrest, the misrepresentation that "defendant had no legitimate reason for being in California" is completely misleading as the defendant has a clothing line registered with the United States Trademark and Patent Office that prominently features the letters "LA" in the Los Angeles Dodgers baseball team font. Moreover, Ms. Cotto fully supported the defendants ambition to launch clothing brand closer to LA by being in Southern California with defendant. Additionally, Ms. Cotto has a sister who lives in the San Francisco Bay area who the defendant and Ms. Cotto visited on several occasions in 2018. Ms. Cotto is employed full-time and financially responsible. These factors completely refute the governments narrative that Ms. Cotto is not a reliable third-party custodian. The government completely skewed the truth with no supporting facts in order to gain a tactical advantage over defendant and intentionally prejudice his defense by keeping him detained at MDC Brooklyn, ~~a~~ ~~facility~~ known troubled facility. The government contending that the defendant was "fleeing from authorities" is also unfounded as there no "Flight to Avoid Prosecution" charges on either Indictment. see 18 USC 1073; see also United States v. Kojayan, 8 F. 3d 1315 (9th Cir. 1993) (The prosecutor's job isn't just to win, but to win fairly, staying well within the rules.); Exhibit "F" (- 1073 statute); Exhibit "G" (Morons)

## VI - MDC Brooklyn Deficiencies

Aside from the defendant questioning his counsels representation, ~~and~~ (see Exhibit "H" - Darrow Trulincs Emails) there are also numerous Constitutional and human rights violations

within the jail. The defendant intentionally began to file complaints in 2021 in order to fully document these deficiencies.

A) Religious Freedom — The defendant requested access to Native American religious services that have been abruptly ended since early 2020. Medicine bag required to practice belief was also requested. Staff refused to address this Constitutional violation. The NorthEast Regional office rejected my complaint because the original BP-8 form was not returned to me. see Exhibit "I" (Relgious Freedom)

B) Food Shortage — In April 2021, the defendant wrote that the unit kitchen ran out of food and staff refused to call for more, causing hunger. This was not a one-off event. The responses are mind boggling, the Warden replies with a copy/paste statement regarding portion sizes. And the NorthEast Regional Office ("NERO") decides to only focus on the time that dinner was served at 8:30 PM, instead of the main point which is the defendant did not eat that night because of staff misconduct. It also took almost 3 months just to get a response from NERO well over the 30 day limit. See exhibit "J" (Food completely depleted)

c) Lack of showers — Although the black mold growing on the shower floor has been recently painted, the main issue is in regards to the defendant's human rights being violated by being locked in a cell for over 72 hours without access to a shower. Again, this is not the first time, nor the last time this has occurred, just the one time the defendant successfully documented the fallacy. see Exhibit "K" — (No showers over 72 hours)

D) Intentionally Refused Law Library Access - The defendant was denied Access to the Courts when the staff refused to unlock his door on multiple occasions prejudicing his defense. This rejection is even more confusing as NERO rejected the complaint because the defendant "did not submit the proper number of continuation pages" when the original complaint is in regards to copies and the appeal to NERO specifically mentions "appropriate number of copies not attached because of inadequate access to copier." It was also requested that this be filed as sensitive because of staff retaliation, but that request was not granted and put the defendants safety in jeopardy. see Exhibit "L" (- Access to Courts)

E) Legal documents discarded - Several Constitutional violations occured when staff intentionally discarded the defendants legal work on May 20,2021 and 11 months prior on June 26, 2020. These two events substantially prejudiced defense and shocked the defendants contemporay conscience. The defendant was never able to receive a Tort claim ("SF-95") form from staff. The defendant requested the forms from the Courts on June 1, 2021, but never received the forms. The defendant followed all steps in the Administrative Remedy process, but was still rejected at every level. see Exhibit "M" (Legal Documents Discarded Intentionally)

F) Threatened With Pepper Spray - On June 06,2021 following a violent incident amongst other inmates, the defendant was then threatened and menaced with pepper spray despite having nothing to do with the incident and standing in his cell. This misconduct by staff shocked the defendants contemporary conscience, both from the threat and the poison spray that circulates through the vents for hours when pepper spray

is discharged. The only remedy is wrapping a blanket around the face and almost suffocating in order to avoid the poisonous gas that causes coughing spasms. see Exhibit "N" - (Threatened With Pepper Spray)

The defendant has to constantly endure situations like the previously mentioned while trying to defend against the charges in the indictments. And even when progress is made, it could suddenly be trashed in a raid, severely hindering and prejudicing defense. From the mold in the showers, to the horrendous food which is potentially and probably all expired (see exhibit "O" - Expired Food Bulletin), to the defendant not feeling a ray of sunshine in years, to the drug overdoses and violent inmate episodes, the defendants time at MDC Brooklyn has felt more like a psychological operation to ensure a guilty plea than a facility to ensure court appearances. It's worth noting that the defendant has not physically been in a Courtroom in almost two-years. All proceedings since then are adjourned or video/teleconferenced raising more questions as to the necessity of pretrial detention.

## VII - Access to Counsel

The defendant's meaningful access to counsel is a "compelling" and "exceptional" reason for release. The Sixth Amendment right to assistance of counsel for his defen[se] is a key component of our criminal justice procedure. MDC Brooklyn continues to violate the 6th Amendment by "unreasonabl[y] interfer[ing] with the accused person's ability to consult counsel." In Benjamin, the Second Circuit held that NYC correctional facilities violated the right to counsel when defense attorney's "routinely face[d] unpredictable, substantial delays in meeting

with clients," and were forced to wait between 45 minutes and 2 hours, or even ~~much~~ substantially longer, after arriving at a facility to see a client." MDC Brooklyn has been violating the right to counsel in this manner since the defendant's arrival at the facility in February 2019, well before the COVID-19 pandemic. As recently as August 03, 2021, counsel waited over 2 hours for the defendant because the defendant was not informed of counsel's visit until an hour after his arrival, and then defendant was forced to wait in the hallway for the staff ~~op~~ operated inmate elevator for over an hour. This was not an isolated incident event as defendant has recently documented over a half dozen instances of these blatant Constitutional violations. These violations occurred with both former and current counsel, and to be clear, these Access to Counsel violations do not serve and further "a legitimate penological interest."

  A. April 08, 2021 - 1 hour 15 minutes
  B. April 15, 2021 - 1 hour
  C. April 20, 2021 - 45 minutes
  D. June 16, 2021 - 55 minutes
  E. June 24, 2021 - 50 minutes
  F. July 01, 2021 - 45 minutes
  G. July 22, 2021 - 1 hour

  These delays only factor in the duration of time the defendant was waiting for the inmate elevator in the hallway. It does not take into account delays in informing defendant of counsels' arrival. Further, inmate legal visits are routinely and abruptly ended by staff after 1-hour. Or visits are rushed because "it is close to count time." see Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir 2001); Overton v. Bazzetta, 539 US 126, 131-32 (2003)

  In March 2021, the defendant wrote a letter to Chief Judge

Brodie alluding to insufficient apprisal of the cause and nature of the accusations in the MKB case, the desire to go to trial promptly by "looking forward to "upcoming "trial," and the appointment of additional counsel. The Sixth Amendment violations were not addressed, but former counsel was replaced during the May 2021 video hearing. To this day, counsel and defendant are unable to meet at length, with a computer, to "discuss the complex and voluminous electronic discovery" that is necessary to prepare adequate defense and for a sufficient apprisal of charges.

## VIII - Conclusion

Throughout these proceedings, the defendant has been unreasonably hindered and substantially prejudiced in his ability to defend himself adequately and to the extent that he desires. Clearly, being unable to inspect or even see the majority of discovery, due process violations, access to courts/access to counsel violations, prosecutorial misconduct, lack of apprisal in the MKB case, ineffective assistance of counsel, no access to any aggravating or mitigating evidence, humiliating and inhuman conditions at MDC Brooklyn, and not even receiving a copy of the Indictment in the MKB case to this day all add up to "exceptional reasons" for release in order to protect the fundamental fairness of the judicial process. see United States v. Lea, 360 F. 3d 401, 403 (2d Cir 2004)(The 2nd Circuit has construed "exceptional reasons" to mean, "a unique combination of circumstances giving rise to situations that are out of the ordinary.)(quoting United States v. Disomina, 951, F.2d, 494, 497 (2d Cir 1991))

Respectfully Submitted,

Andre Wilburn #73608-298

MDC Brooklyn
PO Box 329002
Brooklyn, NY 11232